**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| FREEWAY FOODS OF GREENSBORO, INC. | ) | Case No. 10-11282 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| ———————————————— | ) | |
| | ) | |
| YELLOW SIGN, INC., a Delaware Corporation, and WAFFLE HOUSE, INC., a Georgia Corporation, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Adv. No. 11-02008 |
| | ) | |
| vs. | ) | |
| | ) | |
| FREEWAY FOODS, INC., FREEWAY, FOODS OF GREENSBORO, INC., GARY M. FLY, individually, LYNNE R. FLY, individually, GARY M. FLY, as Trustee of the GMF Family Trust U/A/D December 17, 1999, and LYNNE R. FLY, as Trustee of the LRF Family Trust U/A/D January 18, 2000, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| FREEWAY FOODS OF GREENSBORO, INC., | ) ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JOE W. ROGERS, JR. and KIMBERLY S. KRAFT, | ) ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| ———————————————— | ) | |

**<u>MEMORANDUM OPINION</u>**

The above-captioned plaintiffs (the "Plaintiffs") filed a Third Amended Complaint in this Adversary Proceeding on July 6, 2011. On July 25, 2011, the Chapter 7 trustee (the "Trustee") for the above-captioned debtor ("Freeway Foods") filed a Motion to Dismiss Plaintiffs' Claims against the Freeway Foods (the "Motion to Dismiss"), and Yellow Sign, Inc. ("YSI"), Waffle House, Inc. ("Waffle House"), and Kimberly S. Kraft ("Kraft") filed a Motion for Judgment on the Pleadings (the "Motion for Judgment on the Pleadings" and, together with the Motion to Dismiss, the "Dispositive Motions"). Given the complexity of these matters and the Supreme Court's recent decision in <u>Stern v. Marshall</u>, -- U.S. --, 131 S. Ct. 2594 (U.S. June 23, 2011), the Court held a hearing on September 20, 2011, to address issues regarding the Court's authority to render final judgments on the claims and counterclaims in this Adversary Proceeding.[1] Because the parties need to know whether the Court will be entering final orders on such claims, the Court will consider these issues before considering the merits of the Dispositive Motions. The Court has considered the briefs and the oral argument presented by all parties at the hearing on September 20, 2011, and makes the following findings of fact and conclusions of law.

## I. FACTUAL ALLEGATIONS

The claims at issue in this case stem from a series of events involving the takeover of various Freeway Foods franchises by Waffle House and YSI and the eventual involuntary bankruptcy of

---

[1] The parties were given the opportunity to consent to this Court's authority to enter final judgment in all causes of action and counterclaims in this adversary proceeding. On September 29, 2011, Waffle House, YSI, Kraft, and Rogers filed a written consent to the Court entering a final judgment with regard to all matters. On October 4, the Trustee, on behalf of Freeway Foods, filed a similar consent. The Flys, both individually and as trustees of the GMF Family Trust U/A/D December 17, 1999 and the LRF Family Trust U/A/D January 18, 2000 (together, the "Fly Trusts"), did not consent.

Freeway Foods. Freeway Foods alleges that, starting sometime in 2008, Waffle House and its management, including Kraft and Joe W. Rogers, Jr. ("Rogers"), the CEO of Waffle House, devised a plan to take control of the franchised Waffle House restaurants throughout the United States. Freeway Foods alleges that Waffle House, YSI, Kraft, and Rogers induced franchisees to negotiate better lease terms by creating financial duress, then terminated their franchises, took control of the restaurants, and converted the better lease terms to their own benefit.

Freeway Foods, Inc., owned by Gary and Lynne Fly (the "Flys"), had been a franchisee of Waffle House since 1972, and owned and operated 36 Waffle House restaurants in North Carolina. In 2000, the Flys incorporated Freeway Foods of Greensboro, Inc. to acquire all the stock and assets of Freeway Foods, Inc.  To finance this acquisition, the Freeway Foods entities collectively borrowed more than $12 million from SunTrust Bank (the "SunTrust Loan"), pledging the assets of Freeway Foods, Inc. as collateral.  The Flys and the Fly Trusts guaranteed the loan obligation. In December 2001, Freeway Foods missed a payment on the SunTrust Loan. Freeway Foods contends that it negotiated with SunTrust to adjust the maturity date of the loan and pay all of the accrued interest as well as certain principal payments on a quarterly basis. Freeway Foods also entered into forbearance agreements with SunTrust regarding the maturity date of the loan. After December, 2001, Freeway Foods contends that it remained current on its modified lending terms, and sometime in 2006 or 2007, SunTrust and Freeway Foods stopped executing forbearance agreements in favor of adopting an informal process whereby Freeway Foods would pay accrued interest and as much principal as it could based on monthly cash flow. Freeway Foods claims that pursuant to this informal agreement, as long as Freeway Foods paid the interest and principal as requested, SunTrust would not exercise any remedies.  By the middle of 2009, Freeway Foods had

reduced the outstanding principal to approximately $6.2 million.

Freeway Foods alleges that sometime in 2004, Rogers began insisting that all franchisees do their accounting through Waffle House, and eventually required Freeway Foods to execute an Accounting Services Agreement ("ASA") with Waffle House on January 11, 2007. Under the ASA, Waffle House became responsible for paying all of Freeway Foods' bills, including payroll. To do this, Waffle House obtained electronic access to Freeway Foods' bank account with BB&T as well as a limited power of attorney to write checks on the account. Freeway Foods claims that because Waffle House has company-owned restaurants in the areas east and west of the territory in which its franchises are located, Waffle House began targeting the Freeway Foods franchises for takeover to increase its revenue stream in the area at little additional expense. Freeway Foods alleges that to this end, in February, March, and April 2009, Rogers intentionally discouraged two potential purchasers from buying Freeway Foods franchises by fraudulently announcing that Waffle House planned to build a Waffle House owned restaurant in the middle of Freeway Foods' territory, which would impact any purchaser's profitability at the Freeway Foods location, and even went so far as to tell one potential buyer to "stand down from any interest."

In addition, Freeway Foods contends that Waffle House and YSI fraudulently took control of the SunTrust Loan in order to create financial duress. In 2009, Freeway Foods was able to convince SunTrust to accept a discount on the SunTrust Loan from $6.2 million to $4.5 million. Then, in April 2009, Freeway Foods received a letter of interest from NewBridge Bank for a $4.5 million loan to take out the SunTrust Loan. Freeway Foods contends that it informed Waffle House of these negotiations because, pursuant to the Franchise Agreement, Waffle House would have to consent to any assignment of collateral rights to NewBridge Bank. In May 2009, Kraft allegedly

4

contacted SunTrust and expressed concern about the ability of Freeway Foods to move forward with the loan, and expressed concerns regarding a heavy remodeling schedule that Waffle House was imposing. Waffle House then notified Freeway Foods that it was seeking to purchase the SunTrust Loan itself. Freeway Foods alleges that on May 12, 2009, Rogers contacted Mr. Fly and stated that Freeway Foods would be better off if Waffle House owned the debt because he "was interested in putting money in Mr. Fly's pocket, not the bank's," and that the collateral had greater value to Waffle House than a third-party lender. Freeway Foods contends that as a result of these representations, it ceased its efforts to obtain financing from NewBridge Bank in August 2009.

Freeway Foods alleges that on August 8, 2009, Rogers and Kraft told Mr. Fly that they believed SunTrust would foreclose on the SunTrust Loan if Waffle House did not purchase the debt. Furthermore, Freeway Foods claims that throughout August of 2009, various representatives of Waffle House threatened Freeway Foods' financing. As a result, the Flys assisted Waffle House in negotiating the sale of the SunTrust Loan to Waffle House's affiliate, YSI, and the sale closed on October 2, 2009 for $4.4 million.

On September 2, 2009, as the Waffle House/YSI and SunTrust negotiations were wrapping up, Waffle House sent a Notice of Termination to Freeway Foods claiming that Freeway Foods was insolvent and that Waffle House intended to terminate the Freeway Foods franchises effective November 4, 2009.  Freeway Foods maintains that it was solvent at this time. In addition, after acquiring the SunTrust Loan, Waffle House informed Freeway Foods that it expected Freeway Foods to repay the entire $6.2 million of the SunTrust loan to YSI, despite allegedly making promises to Freeway Foods that it would only be responsible for paying the discounted $4.4 million amount.

5

In order to avoid liability on the personal guaranties made by the Flys and the Fly Trusts, the parties began discussing a "friendly foreclosure" scenario whereby the Flys would turn over the assets of Freeway Foods to YSI and wind-down of the operations as franchises. Under this agreement, Waffle House would hold all of the cash of the Freeway Foods restaurants as of the closing date in escrow to be applied to the Freeway Foods debts as the bills came in. The Flys would be expected to make up any deficiencies, and the Flys would be released from their personal guaranties. The parties reached a final agreement on November 3, 2009, and on November 5, 2009, Kraft indicated that General Counsel for Waffle House and YSI would prepare and deliver the documents by November 12 or 13, 2009. In exchange, Freeway Foods was to obtain an aggregate of $120,000 in rent reductions from its various landlords by November 15, 2009. Freeway Foods alleges that this amount was set in bad faith, based on Waffle House's belief that Freeway Foods would not be able to obtain the required reductions by the deadline. Freeway Foods was able to obtain reductions with respect to all landlords except for two.

Waffle House and Freeway Foods met on November 13, 2009, but instead of executing the documents relating to the "friendly foreclosure," they discussed how to best obtain the reductions from the two hold-out landlords. According to Freeway Foods, Waffle House decided to send letters to the landlords "wrongfully suggesting" that Freeway Foods was on the verge of bankruptcy in an attempt to bully the landlords into deeper discounts. Freeway Foods contends that it refused to approve the letters that YSI and Waffle House drafted, but that Waffle House and YSI nevertheless sent the letters on November 22, 2009. Ultimately, the landlords each agreed to reduce rent by $10,000, which allowed Freeway Foods to meet the required $120,000 in rent reductions. However, Freeway Foods alleges that in December 2009, Waffle House and YSI reneged on the agreement

6

because Freeway Foods had not obtained the $120,000 in rent reductions by the initially agreed upon November 15, 2009 deadline. Then, on January 14, 2010, YSI sent a letter to Freeway Foods claiming that it was in default under the SunTrust Loan and demanding payment in full by March 15, 2010. YSI filed this action in Georgia on February 18, 2010, seeking a declaratory judgment on the issue.

On March 18, 2010, Freeway Foods met with YSI and Waffle House, where YSI presented a Notice of Sale for a private foreclosure scheduled for March 25, 2010, as well as a proposal agreement that would require Freeway Foods to surrender all assets, agree that a deficiency existed, and admit that the Flys would have potential personal liability on the guarantees and that Waffle House and YSI had discretion to determine the amount due on the guaranties. Waffle House presented Freeway Foods with a Notice of Termination of the franchises effective March 25, 2010. Freeway Foods contends that it was solvent at this time. Waffle House and YSI allegedly stated the Freeway Foods must execute certain documents to surrender the collateral by March 19, 2010, otherwise they would proceed with the foreclosure sale. Freeway Foods offered to surrender the collateral on April 6, 2010 and settle all issues, but Waffle House and YSI allegedly declined this offer.

As a result of the breakdown of these negotiations, Freeway Foods set up a new BB&T account to which Waffle House did not have access under the ASA and transferred all its funds into the new account. Freeway Foods allegedly told Waffle House that it should write no checks for Freeway Foods bills without written approval from Freeway Foods and asked for information regarding outstanding invoices or scheduled payments so that it could make those payments directly. On March 24, 2010, Freeway Foods sued Waffle House and YSI in North Carolina, seeking to

enjoin the foreclosure, but that action was unsuccessful. Incidentally, Waffle House and YSI did not proceed with the foreclosure sale as noticed, but instead directed Morgan Stanley Smith Barney to liquidate the contents of a security account (in the amount of $270,000) held by Mr. Fly that was included as collateral for the SunTrust Loan. Waffle House and YSI then issued a Notice of Public Sale on March 30, 2010, setting the date of sale for April 12, 2010. On April 6, 2010, Freeway Foods gave notice of its intent to surrender its restaurants to Waffle House and YSI on April 7, 2010, and provided Waffle House and YSI with terms setting out the process by which it intended to surrender the restaurants.

Freeway Foods terminated all of its employees as of the surrender date. During the transition, the restaurants remained open, and Freeway Foods' employees (other than the Flys) were employed by Waffle House without interruption. According to Freeway Foods, the employees were instructed to follow normal protocol, and deposit all of the cash in the drawers in the restaurants as of 7:00 a.m. on April 7, 2010 to the Waffle House accessible account with BB&T, with the understanding that all cash received after that date would be the property of Waffle House and YSI. Freeway Foods, however, claims that Waffle House executives instead directed the employees to deposit the cash (which amounted to approximately $40,000) into an account controlled exclusively by Waffle House and YSI. On April 8, 2010, a Waffle House accountant notified Freeway Foods that payroll was due, and that there were outstanding vendor invoices. Freeway Foods allegedly told her that payroll should be paid, that it would transfer funds into the Waffle House accessible BB&T account for that purpose, and that no other checks should be issued. That same day, Freeway Foods transferred $189,695 to the BB&T account to cover the payroll amounts. Shortly after the transfer, $107,851.75 in vendor checks were paid overnight out of the account. Freeway Foods then

transferred the remainder of the funds out of the account "to protect what was left of the payroll deposit" and to prevent further payment to vendors. Freeway Foods contends that it notified Waffle House that it had removed these funds and therefore there were no funds in the account. Freeway Foods claims that it demanded the return of the $107,851.75 issued to vendors, but that Waffle House refused and also sent checks payable to employees drawn from the account, knowing that there was no money to cover those checks. Freeway Foods had traditionally paid its employees in cash on Sundays—Freeway Foods alleges that Waffle House switched this practice and paid with checks that it knew would bounce in an attempt to "embarrass Freeway Foods in the marketplace" and "jeopardize Freeway Foods' position with the authorities." Freeway Foods contends that Waffle House also gave each employee Mr. Fly's cell phone number along with the bad checks and told the employees to call Mr. Fly if there was a problem with payment.

On April 12, 2010, YSI conducted its foreclosure sale. Only one bidder attended—WH Assets, Inc. ("WH Assets"), a Waffle House affiliate that YSI had indicated would be the buyer in the private sale originally scheduled for March 26, 2010. WH Assets bid $1,500,000 for the restaurants, but Freeway Foods claims that WH Assets actually paid nothing to YSI. After taking over the Freeway Foods' franchises, Waffle House closed three restaurants where Freeway Foods was not able to obtain rent concessions in the amount that Waffle House had requested. According to Freeway Foods, Waffle House plans to reopen one of those locations after negotiating better lease terms. Waffle House claims no liability on the other two leases and therefore maintains that it owes the two landlords nothing for rent unless it formally accepts the Freeway Foods leases and operates the restaurants.

## II. PROCEDURAL POSTURE

On February 18, 2010, YSI filed an action for declaratory judgment against Freeway Foods and Gary and Lynne Fly in Fulton County, Georgia, seeking a determination that Freeway Foods was in default under the SunTrust loan owned by YSI.  On March 24, 2010, Freeway Foods and the Flys filed an Answer and Counterclaim against YSI.  On April 15, 2010, YSI filed a Second Amended Complaint and Request for Appointment of a Receiver as well as an Emergency Motion for Appointment of a Receiver and Temporary Restraining Order.  On April 23, 2010, an Order was entered denying both YSI's request for a receiver and request for a restraining order.  On July 6, 2010, YSI and Waffle House filed a Third Amended Complaint against Freeway Foods and the Flys, and on July 7, 2010, Freeway Foods and the Flys filed a First Amended Counterclaim and Third-Party Complaint against YSI, Waffle House, Rogers (the Chairman and largest shareholder of Waffle House and YSI), and Kraft (the CFO of Waffle House and Assistant Treasurer of YSI).  Then, on October 26, 2010, Freeway Foods filed a notice of removal to the United States District Court for the Northern District of Georgia.  On November 12, 2010, Freeway Foods and the Flys filed a motion to transfer the case to the Middle District of North Carolina, and it was transferred on December 6, 2010.  On April 7, 2011, the case, now an adversary proceeding, was transferred to this Court.  On August 19, 2011, the Motion to Dismiss was filed by Kraft, Rogers, Waffle House, and YSI.  On August 26, 2011, both the Chapter 7 Trustee for Freeway Foods and the Flys filed Answers to the Third Amended Complaint.

### III. DISCUSSION

**A.    The Authority of the Bankruptcy Court to Enter Final Judgments**

**1. The Forerunner of Bankruptcy Jurisdiction**

The judicial branch of the United States government was based on the English model.  The

Fed. Court Sys. in the U.S., Admin. Office of the Courts 22 (3d ed. 2010) ("The American judicial process is based largely on the English common law system."); Lawrence M. Friedman, A History of Am. Law 66-69 (3d ed. 2005); see Ralph Brubaker, Article III's Bleak House (Part I): The Statutory Limits of Bankr. Judges' Core Jurisdiction, 31 No. 8 Bankr. L. Letter 1, 7 (Aug., 2011) [hereinafter "Brubaker, Part I"] ("American bankruptcy jurisdiction developed . . . from an English system"). English law provided for courts of law and courts of equity. Bankruptcy courts were courts of equity. Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 43, 109 S.Ct. 2782, 2791 (1989). These courts decided matters involving property of the bankrupt and adjudicated disputes between debtors and creditors, such as the amount of a debt or the validity of a lien. Id. at 43-47. There was no right to a trail by jury in English bankruptcy courts. Brubaker, Part I at 7 ("the English model of a jurisdiction in bankruptcy was, very explicitly, an in rem, property-based jurisdiction-- centered around the construct of a bankrupt's 'estate.'").

Under English law, actions that were legal in nature, based on common law, were decided by courts of law. Granfinanciera, 492 U.S. at 43-47. These courts decided actions that aimed to bring assets into the estate. Id. In such actions, the parties had the right to a trial by jury. Id.

Article I of the Constitution provides for the creation of bankruptcy courts.[2] Article III provides for the judicial branch of our government.[3] The difference between an Article I court and an Article III court is that the salary of an Article III judge may not be reduced and the Article III

---

[2] Congress has the power "To establish . . . uniform Laws on the subject of Bankrupties throughout the United States" and "To constitute Tribunals inferior to the supreme [sic] Court." U.S. Const. art. I, § 8.

[3] "The judicial Power of the United States, shall be vested in one supreme [sic] Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behavior, and shall, at stated Times, receive for their Services a Compensation which shall not be diminished during their Continuance in Office." U.S. Const. art. III, § 1.

judge has lifetime tenure.  Stern, 131 S. Ct. at 2600.

Generally Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty."  In re Fairfield Sentry Ltd., et al. Litig., 458 B.R. 665, 687 (S.D.N.Y. 2011) (citing Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372 (1856)).  Congress cannot ignore these differences by authorizing an Article I court to decide actions at common law, which are legal in nature.  In other words, Congress cannot make a law that allows an Article I court to decide a matter that an Article III court is required by our Constitution to decide. N. Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 73 (1982) ("[W]here Art. III does apply [to a cause of action], all of the legislative powers specified in Art. I and elsewhere are subject to it."); see, e.g., Ex parte Bakelite Corp., 279 U.S. 438, 449, 49 S.Ct. 411, 412 (1929); Am. Ins. Co. v. Canter, 26 U.S. 511, 546 (1828); Murray's Lessee, 18 How. at 284.

## 2. The Bankruptcy Act of 1898

The first permanent bankruptcy law in America,[4] the Bankruptcy Act of 1898, was based on the English model of bankruptcy jurisdiction[5]. Under the Act, bankruptcy judges (called "referees") exercised summary jurisdiction[6] over the assets of the bankrupt entity—essentially in rem

---

[4]For a general history of the development of American bankruptcy law, see Brubaker, Part I at 8-9.

[5]"The 1898 Act reduced the sweep of federal bankruptcy jurisdiction essentially through a return to the English in rem model of bankruptcy jurisdiction, in the now-infamous summary/plenary jurisdictional dichotomy erected by the 1898 Act."  Brubaker, Part I at 9.

[6]"'Summary' jurisdiction accurately connoted the more informal and expeditious nature of the proceedings, initiated by a motion, petition, or application, with a relatively short notice period before a hearing, where the evidence would often be presented through affidavits." Brubaker, Part I at 10.

jurisdiction.[7] Bankruptcy courts decided bankruptcy causes of action and matters that adjusted the debtor-creditor relationship, such as the amount of claims against the estate and the validity of liens.[8] Thomas S. Marion, Core Proceedings and 'New" Bankr. Jurisdiction, 35 DEPAUL L. REV. 675, 677 n.12 (1986).  Not coincidentally, parties did not have a right to a trial by jury in bankruptcy court.[9]

Under the 1898 Act, not all matters relating to the bankruptcy case could be heard by the bankruptcy court in the exercise of its summary jurisdiction. Circuit courts (later district courts) exercised plenary jurisdiction over non-bankruptcy causes of action.[10]  Bankr. Act of 1898 § 23a, Pub. L. No. 55-171, 30 Stat. 55, 552 (repealed 1979).  Actions brought under the plenary jurisdiction of these Article III courts were analogous to common-law causes of action ordinarily decided in English courts of law in the 18th century, as opposed to those customarily heard by courts of equity or admiralty. See Grandfinanciera, 492 U.S. at 41.  Any cause of action against third parties to bring assets into the bankruptcy estate required a plenary suit and was decided by such courts.  See

---

[7]"Under the 1898 Act, there was summary in rem jurisdiction in the federal courts to adjudicate all disputes incident to administration of property in the actual or constructive possession of the court (through its officer, the bankruptcy trustee), and this summary in rem jurisdiction included adjudication of all creditors' claims against the estate. There was no summary in rem jurisdiction, however, over trustees' suits to recover money or property for the estate--so-called plenary suits against "adverse claimants"--and that is the means by which the 1898 Act curtailed federal bankruptcy jurisdiction." Brubaker, Part I at 9-10.

[8]"Under the 1898 Act, the referees, later bankruptcy judges, had summary jurisdiction to enter final orders over three classes of proceedings: a) administrative matters, b) matters where the court had actual or constructive possession of a res (including the debtor's body), in custodia legus, and c) matters where the parties consented." Ronald Peterson, Stern v. Marshall Bleak House Revisited, 27 NAB TALK 10, 14 (Fall 2011).

[9]"Most significantly, jury trial rights attached to any plenary legal action by the trustee against an adverse claimant, but the litigants had no jury trial rights (either statutory or under the Seventh Amendment) in summary proceedings."  Brubaker, Part I at 10.

[10]"Exercises of 'plenary' jurisdiction, . . . as the name . . . indicates, required a full plenary suit: an ordinary civil action in federal court conducted according to normal rules of civil procedure, including summons and complaint, formal pleadings, discovery, and trial, all according to the timetables for and in precisely the same manner as a normal civil action." Brubaker, Part I at 10.

Schoenthal v. Irving Trust Co., 287 U.S. 92, 94-95, 53 S.Ct. 50, 51 (1932) (suits to recover preferences do not constitute proceedings in bankruptcy because there is an adequate remedy at law); see also Marshall v. Knox, 83 U.S. 551 (1872), Smith v. Mason, 81 U.S. 419 (1871) (bankruptcy court could not make the adverse claimant a party to the bankruptcy proceedings and adjudge his rights in a summary way).   The parties had a right to a trial by jury.   See Grandfinanciera, 492 U.S. at 49-50.

In summary, the distinctions between bankruptcy courts and districts courts under the Bankruptcy Act of 1898 were the same as the distinctions between English courts of equity and courts of law.  Bankruptcy courts exercised summary jurisdiction over bankruptcy causes of action and property of the bankruptcy estate, with no right to a jury trial.  District courts exercised plenary jurisdiction over non-bankruptcy causes of action, with the parties having a right to a trial by jury.

### 3. The Bankruptcy Reform Act of 1978 and Marathon

The Bankruptcy Reform Act of 1978 was intended to eliminate the distinction between summary and plenary jurisdiction.[11]  Congress intended for the newly created bankruptcy courts to

---

[11]Marathon, 458 U.S. at 54 ("Eliminating the distinction between 'summary' and 'plenary' jurisdiction, the Act grants the new courts jurisdiction over all 'civil proceedings arising under title 11 [the Bankruptcy title] or arising in or related to cases under title 11.' 28 U.S.C. § 1471(b) (1976 ed., Supp.IV)") (footnote omitted); Ralph Brubaker, One Hundred Years of Fed. Bankr. Law and Still Clinging to an In Rem Model of Bankr. Jurisdiction, 15 BANKR. DEV. J. 261, 263 (1999) (The Bankruptcy Reform Act of 1978 "was explicitly designed to eliminate the summary/plenary dichotomy and its in rem confines, permitting the federal courts to exercise in personam as well as in rem jurisdiction in order that they may handle everything that arises in a bankruptcy case."); S. REP. NO. 95-989, at 153 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5939; accord H.R. REP. NO. 95-595, at 48-49 ("Possession of the res [ ] that is the subject of a particular proceeding will no[ ] longer be relevant. The bankruptcy courts will have in personam jurisdiction over all proceedings, whether or not involving a specific item of property."), reprinted in 1978 U.S.C.C.A.N. at 6010; see also Celotex, 514 U.S. at 308 (stating that the Bankruptcy Reform Act "must be read to grant jurisdiction over more than simple proceedings involving the debtor's property or the estate").

exercise broader jurisdiction than referees had exercised under the Bankruptcy Act of 1898, and to

that end vested "judges of the bankruptcy courts . . . with all of the 'powers of a court of equity, law,

and admiralty.'" 28 U.S.C. § 1481 (1982. ed.) (repealed); <u>Marathon</u>, 458 U.S. at 55.  As Justice

Stevens explained,

> The 1978 Act significantly restructured the Bankruptcy Code. The Act created
> "bankruptcy courts" and vested in them "jurisdiction over all 'civil proceedings
> arising under title 11 [the Bankruptcy title] or arising in or related to cases under title
> 11.' " <u>Northern Pipeline</u>, 458 U.S., at 54, 102 S.Ct., at 2862, quoting 28 U.S.C. §
> 1471(b) (1976 ed., Supp. IV). As the plurality opinion in <u>Northern Pipeline</u> observed,
> "[t]his jurisdictional grant empowers bankruptcy courts to entertain a wide variety
> of cases," involving "claims based on state law as well as those based on federal
> law." 458 U.S., at 54, 102 S.Ct., at 2863. The Act also bestowed upon the judges of
> the bankruptcy courts broad powers to accompany this expanded jurisdiction. <u>See</u> n.
> 6, <u>supra</u>; <u>Northern Pipeline</u>, 458 U.S., at 55, 102 S.Ct., at 2863. The Act did not,
> however, make the newly empowered bankruptcy judges Article III judges. In
> particular, it denied bankruptcy judges the life tenure and salary protection that the
> Constitution requires for Article III judges. <u>See</u> U.S. CONST. art. III, § 1.

<u>Celotex Corp. v. Edwards</u>, 514 U.S. 300, 318 (1995) (dissenting opinion).  In his dissenting opinion

in <u>Marathon</u>, Justice White asserted that real difference between the 1898 and 1978 Acts lay in the

fact that the Bankruptcy Act of 1898 allowed bankruptcy courts to exercise <u>in rem</u> jurisdiction, but

the Bankruptcy Reform Act of 1978 allowed them to exercise both <u>in rem</u> and <u>in personam</u>

jurisdiction:

> Prior to 1978, a claim of a bankrupt against a third party . . . was not within the
> jurisdiction of the bankruptcy judge. The old limits were based, of course, on the
> restrictions implicit within the concept of <u>in rem</u> jurisdiction; the new extension is
> based on the concept of <u>in personam</u> jurisdiction. "The bankruptcy court is given <u>in
> personam</u> jurisdiction as well as <u>in rem</u> jurisdiction to handle everything that arises
> in a bankruptcy case." H.R.Rep.No. 95–595, p. 445 (1977), U.S.Code Cong. &
> Admin.News 1978, p. 6400. The difference between the new and old Acts, therefore,
> is not to be found in a distinction between state-law and federal-law matters; rather,
> it is in a distinction between <u>in rem</u> and <u>in personam</u> jurisdiction.

<u>Marathon</u>, 458 U.S. at 97.

15

In Marathon, the Supreme Court ruled that the Bankruptcy Reform Act's broad grant of jurisdiction to bankruptcy judges violated Article III of the Constitution. 458 U.S. at 87 (plurality opinion).   The Court rejected the public rights doctrine[12] as a basis for upholding the constitutionality of the Bankruptcy Reform Act. Id. at 71.[13] It also rejected the argument[14] that the bankruptcy court is merely an adjunct to the district court and that "the delegation of certain adjudicative functions to the bankruptcy court is accordingly consistent with the principle that the

---

[12]Although the general rule is that non-Article III courts cannot decide matters that the Constitution requires Article III courts to decide, an exception to the rule is that matters involving public rights may be assigned by Congress to legislatively created courts. Fairfield Sentry, 458 B.R. at 687. This exception is known as the public rights doctrine. Public rights have been defined as involving disputes "between the Government and persons subject to its authority" as opposed to "the liability of one individual to another under the law." Id. The Stern court described public rights as those rights "integrally related to particular federal government action." Stern, 131 S.Ct. at 2613. The Marathon court explained that the public rights doctrine
    extends only to matters arising "between the Government and persons subject to
    its authority in connection with the performance of the constitutional functions of
    the executive or legislative departments," and only to matters that historically
    could have been determined exclusively by those departments.
Marathon, 458 U.S. at 67-68. Public rights "depend[ ] on the will of congress," "flow from a federal statutory scheme," are "completely dependent upon adjudication of a claim created by federal law," or are "limited to a particularized area of the law." Fairfield Sentry, 458 B.R. at 687 (citing Stern, 131 S.Ct. at 2614).
    The public rights doctrine provides that if Congress creates an independent federal right, then it may assign adjudication of that right to an Article I court. "Under the 'public rights' exception, an Article I court may hear cases where 'Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, [has] create[d] a seemingly "private" right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary.'" In re GB Herndon and Assocs., Inc., 459 B.R. 148, 163 (Bankr. D. Col. 2011) (citing Thomas v. Union Carbide Ag. Prods. Co., 473 U.S. 568, 586, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)). But where the right exists in the common law, Congress may not constitutionally assign adjudication of that right to a non-Article III court because "Congress has nothing to do with it." Stern, 131 S.Ct. at 2614; Murray's Lessee, 18 How. at 284.
    [13]"[T]he restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a 'public right,' but the latter obviously is not." Marathon, 458 U.S. at 71.
    [14]Id. at 84-85.

judicial power of the United States must be vested in Art. III courts." Id. at 77. In Thomas, the Supreme Court characterized the Marathon holding as "establish[ing] only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review." 473 U.S. at 584.

One commentator has suggested that the main reason underlying Marathon's conclusion that non Article III judges cannot decide state-law causes of action is that it had never been allowed in any bankruptcy statute prior to the 1978 Reform Act: "[T]he most objectionable aspect of the 1978 Reform Act, in the eyes of the Court, was that it simply went beyond the 1898 Act in the jurisdictional authority entrusted to a non-Article III arbiter. Thus, it seems that Marathon essentially constitutionalized the 1898 Act's divide between summary and plenary proceedings . . ." Ralph Brubaker, Article III's Bleak House (Part II): The Statutory Limits of Bankr. Judges' Core Jurisdiction, 31 No. 9 Bankr. L. Letter 1, 6-7 (Sept., 2011) [hereinafter "Brubaker, Part II"].

### 4. The Bankruptcy Amendments and Federal Judgeship Act of 1984

In response to Marathon, Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, 98 Stat. 333. (the "BAFJA"), which repealed all provisions of the Bankruptcy Reform Act involving bankruptcy jurisdiction and established the current bankruptcy jurisdictional scheme. With the enactment of the BAFJA, Congress intended to eliminate not only the functional independence of the bankruptcy court, but also its very existence as a separate court. See Statement of Orrin G. Hatch, 130 CONG. REC. S8891 (1984), reprinted in 1984 U.S.C.C.A.N. 576, 590. Bankruptcy judges became "judicial officers of the United States district court." 28 U.S.C. § 152(a)(1). The bankruptcy judges in a federal district now constitute a "unit of

17

the district court to be known as the bankruptcy court for that district." 28 U.S.C. § 151.  Thus, "bankruptcy courts no longer exist as distinct jurisdictional entities, but rather have been subsumed within each district court." Volpert v. Ellis, 177 B.R. 81, 88 (N.D. Ill. 1995).  Under the BAFJA, bankruptcy judges are appointed to 14-year terms by the courts of appeals for the circuit in which their district is located. 28 U.S.C. § 152(a)(1).

Under the BAFJA, district courts have original and exclusive jurisdiction over all cases under Title 11. 28 U.S.C. § 1334(a).  District courts also have original but not exclusive jurisdiction over all civil proceedings arising under, arising in, or related to cases under Title 11.  28 U.S.C. § 1334(b). District courts are authorized to refer all cases and proceedings under title 11 to the bankruptcy courts. 28 U.S.C. § 157(a).  Pursuant to Local Rule 83.11, the United States District Court for the Middle District of North Carolina automatically refers all bankruptcy cases and proceedings to the bankruptcy judges of this district.  The district court may, however, withdraw such reference at any time pursuant to 28 U.S.C. § 157(d).  Thus, while the referral of a bankruptcy case or proceeding in this district is automatic, it is also revocable.

A bankruptcy judge's authority to enter a final order hinges on whether the bankruptcy proceeding is "core" or "non-core."  28 U.S.C. § 157; Valley Historic Ltd. P'ship v. Bank of N.Y., 486 F.3d 831, 839 n.3 (4th Cir. 2007); In re Morabito, 64 F.3d 658, at *2 (4th Cir. 1995); In re Freeway Foods of Greensboro, Inc., 449 B.R. 860, 872 (Bankr. M.D.N.C. 2011). However, the core/non-core dichotomy does not determine the bankruptcy court's jurisdiction.[15] A bankruptcy

---

[15]"Whether a proceeding is core or non-core is beside the point for determining jurisdiction because "[t]hat allocation [of core and non-core] does not implicate questions of subject matter jurisdiction." Stern, 131 S.Ct. at 2607.  So long as a proceeding is one or the other, the Bankruptcy Court possessed subject-matter jurisdiction." Ace Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings Corp.), No. 10-4170-bk, slip op. (2d Cir. Nov. 29, 2011).

court has the authority to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157(b)(1). Thus, section 157(b)(1) gives bankruptcy judges the authority to enter final orders in core proceedings.[16]  Section 157(b)(2) contains a non-exhaustive list of sixteen core proceedings. For non-core proceedings that otherwise relate to the bankruptcy case under title 11, "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court." 28 U.S.C. § 157(c)(1).  A civil proceeding is "related to" a Title 11 case if the action's outcome might have any conceivable effect on the bankrupt estate.  Valley Historic Ltd. P'ship, 486 F.3d at 836; New Horizon of N.Y. LLC v. Jacobs, 231 F.3d 143, 155 (4th Cir. 2000); Freeway Foods, 449 B.R. at 873.  If the proceeding in question is not "related to" the bankruptcy, then the bankruptcy court has no jurisdiction to hear the matter at all.  See 28 U.S.C. § 1334(b); Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (a court which lacks subject matter jurisdiction cannot hear

---

[16]Core proceedings are those that either arise under Title 11 or arise in a bankruptcy case. In re Nichols & Assocs. Tryon Props., Inc., 36 F.3d 1093, *3 (4th Cir. 1994); Wood v. Wood (In re Matter of Wood), 825 F.2d 90, 96 (5th Cir. 1987). Cases "arise under" Title 11 when the cause of action or substantive right claimed is created by the Bankruptcy Code. Johnson v. Residential Funding Co., LLC, 2011 WL 532024, *1 n.2 (D. Md. Feb. 8, 2011); In re 3G Props., LLC, 2010 WL 4027770, at *2 (Bankr. E.D.N.C. Oct. 14, 2010); In re Langford, 2007 WL 3376664, at *3 (Bankr. M.D.N.C. Nov. 2, 2007).  Cases "arise in" a title 11 proceeding if they "are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." In re A.H. Robins Co., Inc., 86 F.3d 364, 371 (4th Cir. 1996) (quoting Wood, 825 F.2d at 97); 3G Props., 2010 WL 4027770, at *2.  "[C]ore proceedings should be given a broad interpretation that is close to or congruent with constitutional limits." Fairfield Sentry, 458 B.R. at 675; In re Johnson, 960 F.2d 396, 401 (4th Cir.1992) ( "Many courts construe the term 'core proceedings' quite broadly. Indeed, the ambiguity in § 157(b)(2) invites such interpretation with such broadly inclusive language that encompasses proceedings 'affecting the liquidation of assets of the estate' and matters 'concerning the administration of the estate.'"); In re Arnold Print Works, Inc., 815 F.2d 165, 168 (1st Cir.1987); In re Mankin, 823 F.2d 1296, 1301 (9th Cir.1987).

the matter at all and must dismiss it); Celotex, 514 U.S. at 308 n.6 ("[B]ankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor."). Thus, in response to Marathon, Congress enacted the BAFJA, which draws a core/non-core line to delineate between those proceedings in which a bankruptcy court can enter final orders and those in which it cannot.[17]

Until Stern, most courts had very little reason to question the constitutionality of the BAFJA. See In re Apex Exp. Corp., 190 F.3d 624, 631 (4th Cir. 1999) (applying and interpreting BAFJA's core/non-core distinction); Wood, 825 F.2d 90 (interpreting and applying the jurisdictional provisions of BAFJA); In re Ben Cooper, Inc., 896 F.2d 1394 (2d Cir. 1990) (assuming the constitutionality of the BAFJA without analysis); Meoli v. Huntington Nat'l Bank (In re Teleservices Grp., Inc.), 456 B.R. 318, 320 (Bankr. W.D. Mich. 2011) ("For over twenty-five years, my colleagues and I have operated with the understanding that we were properly constituted judges capable of rendering final judgments in many, but not all, matters arising in connection with a bankruptcy proceeding.").

In 1989, the Supreme Court decided Granfinanciera, holding "that common-law actions to augment the size of the estate involving disputed facts to be determined by a jury are not core, as opposed to actions to divvy up and order claims against the estate, which are [core]." Fairfield Sentry, 458 B.R. at 688 (citing Granfinanciera, 492 U.S. at 56). This distinction recalls the

---

[17]"Although Marathon and BAFJA contemplated no change whatsoever in the sum total of federal bankruptcy jurisdiction, they have nonetheless converted the statute's three jurisdictional nexuses into terms of art that draw a divide in this federal bankruptcy jurisdiction between (1) "core" proceedings "arising under" or "arising in," in which a bankruptcy judge can enter final orders, and (2) noncore "related to" proceedings, in which only a district court can enter final orders absent consent of the parties to a bankruptcy court adjudication."  Brubaker, Part I at 16 (quoting Ralph Brubaker, On the Nature of Fed. Bankr. Jurisdiction: A Gen. Statutory & Constitutional Theory, 41 WM. & MARY L. REV. 743, 857 (2000) (footnotes omitted))

summary/plenary dichotomy under the Bankruptcy Act of 1898, which itself harkens back to the differences between courts of law and equity in the English judicial system. The majority opinion in Stern relied on the distinction drawn in Granfinanciera between actions "to augment the bankruptcy estate" and actions to determine a creditor's right to receive "a pro rata share in the bankruptcy res," ultimately concluding bankruptcy courts have constitutional authority to enter final judgment in the latter, but not the former, causes of action. See Kenneth Klee, On the Supreme Court's Holding in Stern v. Marshall, 2011 U.S. LEXIS 4791, at *4 (2011).

### 5. Stern v. Marshall

On June 23, 2011, the Supreme Court decided Stern v. Marshall. Since then, many litigants and courts have struggled to understand the Stern's reasoning and apply its holding. See, e.g., Teleservices Grp., 456 B.R. at 323 ("[Stern] offers virtually no insight as to how to recalibrate the core/non-core dichotomy. . . ."); In re Custom Contractors, LLC, – B.R. –, 2011 WL 6046397, at *4 (Bankr. S.D. Fla. Dec. 5, 2011) ("The Stern Court did not directly address the authority of bankruptcy courts to enter final orders in fraudulent conveyance actions and explicitly intended its decision to be read narrowly."); Kirschner v. Agoglia (In re Refco Inc.), – B.R. –, 2011 WL 5974532, at *2 (Bankr. S.D.N.Y. Nov. 30, 2011) (Stern "raises the issue whether there is a gap in the statutory scheme preventing the [Bankruptcy] Court's submission of proposed conclusions of law to the district court if a matter falls into the new 'core but precluded' category,"). The facts of Stern are interesting but not particularly helpful to the task before this Court.[18] In Stern, the

---

[18]For an extensive discussion of the facts and procedural posture of Stern, see In re USDigital, Inc., – B.R. –, 2011 WL 6382551, at *2-3 (Bankr. D. Del. Dec. 20, 2011); In re Safety Harbor Resort & Spa, 456 B.R. 703, 707-10 (Bankr. M.D. Fla. 2011); Brubakker, Part I at 2-6.

Supreme Court determined that 28 U.S.C. § 157(b)(2)(C) authorized bankruptcy courts to enter final judgments on counterclaims that were asserted against proofs of claim filed by creditors. Stern, 131 S.Ct. at 2608. The Court found, however, that the counterclaim in question–a state law claim for tortious interference with an expected gift–existed without regard to any bankruptcy proceeding, and a final judgment could not be entered by a non-Article III court.[19] Id. at 2618. Therefore, 28 U.S.C. § 157 was unconstitutional in its application to the counterclaim in question. Id. at 2620.

The Stern court emphasized a point made in Marathon: as Article I courts, bankruptcy courts many not enter final judgments in non-bankruptcy matters that are based on the common law or state law. Stern, 131 S.Ct. at 2609. Consistent with separation of powers principles, the majority impressed that "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'" Id. (citing Murray's Lessee, 18 How. at 284; Marathon, 458 U.S. at 70 n.25 ("What clearly remains subject to Art. III are all private adjudications in federal courts within the States— matters from their nature subject to 'a suit at common law or in equity or admiralty' . . . "). Article III protects a constellation of judicial power, specifically "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789" from encroachment by the other branches. Id. at 2609 (quoting Marathon, 458 U.S. at 90 (Rehnquist, J., concurring)). Bankruptcy courts, as non-Article III tribunals, therefore

---

[19]"Stern distinguished prior cases that considered trustees' counterclaims against proofs of claim by noting that whereas those counterclaims 'assert[ed] a right of recovery created by federal bankruptcy law,' the tortious interference claim was 'in no way derived from or dependent upon bankruptcy law.'" SIEGEL v. FDIC (In re Indymac Bancorp Inc.), 2011 WL 2883012, at *6 (C.D. Cal. July 15, 2011) (quoting Stern, 132 S.Ct. at 2618). See Fairfield Sentry, 458 B.R. at 688 (S.D.N.Y. Sept. 19, 2011) (citing Stern, 131 S.Ct at 2611) ("Pre-petition common law actions for a claim requiring adjudication of factual disputes unrelated to bankruptcy are not core claims. These claims are private rights because they are 'state law action[s] independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy.'").

lack constitutional authority to finally adjudicate state-created private rights.  Id. at 2620; see also Marathon, 458 U.S. at 71 ("the restructuring of debtor-creditor relations . . . must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case.").

From this analysis, Stern provides a two-prong test: "the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." Stern, 131 S.Ct. at 2618.  If either prong of the test is met, then the bankruptcy court has constitutional authority to enter a final order.  Conversely, if the action neither stems from the bankruptcy itself nor would necessarily be resolved in the claims allowance process, the bankruptcy court lacks constitutional authority to enter final judgment and may only submit proposed findings of fact and conclusions of law to the district court.

As many courts have noted, the Supreme Court emphasized in Stern that 28 U.S.C. § 157 is not a jurisdictional statute: "Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court. That allocation does not implicate questions of subject matter jurisdiction."  Stern, 131 S.Ct. at 2607.[20]

## B.      The Plaintiffs' Causes of Action

The Court will consider the claims in the Third Amended Complaint filed by Waffle House

---

[20]See In re Soporex, Inc., – B.R. –, 2011 WL 5911674, at *2 n.4 (Bankr. N.D. Tex. Nov. 28, 2011) ("The Court in Stern . . . expressly clarified that 28 U.S.C. § 157 is not jurisdictional."); In re Wilderness Crossings, LLC, 2011 WL 5417098, at *1 (Bankr. W.D. Mich. Nov. 8, 2011) ("28 U.S.C. § 157 is not a jurisdictional statute.");Teleservices Grp., 456 B.R. at 320 n.3 (Bankr. W.D. Mich. 2011) ("Although 28 U.S.C. § 157 sounds jurisdictional, it is not."); Stoebner v. PNY Techs., Inc. (In re Polaroid Corp.), 451 B.R. 493, 495 n.6 (Bankr. D. Minn. 2011) ("As Stern v. Marshall emphasizes, this is not a matter of jurisdiction. Bankruptcy jurisdiction reposes in the United States District Court, under 28 U.S.C. § 1334(a).") (citation omitted).

and YSI and determine, pursuant to <u>Stern</u>, whether it can enter a final judgment regarding such claims.

### 1. Declaration of Default Under Credit Agreement for Failure to Produce Documents

YSI and Waffle House allege that Freeway Foods has defaulted under the Credit Agreement, which is one of the contracts that were assigned to YSI by SunTrust when YSI purchased the SunTrust loan. The alleged default is based on the failure to produce certain documents. The Trustee argues that this is a claim against the Freeway Foods estate, not a counterclaim, so the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B) ("allowance or disallowance of claims against the estate"). The Flys, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy as that term is used in 28 U.S.C. § 1334(b)[21] and that the Court may only submit proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1).[22]

This claim is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), but does it also satisfy one or both prongs of the <u>Stern</u> test?  It is a state law contract claim and does not stem from the bankruptcy itself, so the only remaining question is whether it would necessarily be resolved in the claims allowance process. Waffle House filed a proof of claim in the amount of $165,023.17 for rent, royalties, bookkeeping, and several other categories of debts pursuant to certain contracts,

---

[21]"[T]he district courts hall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).

[22]"A bankruptcy judge may hear a proceeding that is not a core proceeding, but that is otherwise related to a cause under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected."  28 U.S.C. § 157(c)(1).

principally a Franchise Agreement, between Waffle House and Freeway Foods. YSI filed a proof

of claim in the amount of $5,399,880.58 for repayment of the loan that it purchased from SunTrust.

Although it is not necessary to determine if Freeway Foods defaulted under the Credit Agreement

in order to determine whether Freeway Foods is indebted to Waffle House under the Franchise

Agreement, it is necessary to make that determination to allow the YSI proof of claim. Since YSI

filed a proof of claim for all sums due under the SunTrust loan documents, including the Credit

Agreement, the existence of a default under that agreement must be determined by the Court.

Therefore, pursuant to Stern, the Court has the constitutional authority to enter a final judgment

regarding this claim. See In re Byce, 2011 WL 6210938, at *2 (D. Idaho Dec. 14, 2011) ("The

bankruptcy court thus has the constitutional authority to finally determine JustMed's

claim—including state-law issues that arise within that claim. Stern did not hold that the bankruptcy

court may not rule on state law issues when determining a proof of claim.") (citing In re Salander

O'Reilly Galleries, 435 B.R.106, 117 (Bankr. S.D.N.Y. 2011));  Fleury v. Specialized Loan

Servicing, LLC, 2011 WL 4851141, at *2 (Bankr. E.D. Cal. Oct. 6, 2011) ("The question, as framed

by the Supreme Court in Stern is, whether the action at issue stems from the bankruptcy itself or

would necessarily be resolved in the claims allowance process. Here, the validity of the deed of trust,

which creates the secured claim, is an issue that would plainly be resolved in the claims allowance

process."); GB Herndon, 459 B.R. at 164 (debtor's counterclaims were necessarily resolved by

resolution of creditor's proof of claim, such that court had authority to enter final order on debtor's

counterclaims); In re Oxford Expositions, LLC, 2011 WL 4074028, at *9 (Bankr. N.D. Miss. Sept.

13, 2011) ("The Stern opinion does not abrogate the authority of a bankruptcy court to enter a

judgment on a state law counterclaim that by necessity must be resolved in the process of ruling on

25

the creditor's proof of claim. Consequently, where the two are inextricably tied, the counterclaim could conceivably still be a core proceeding."); In re Olde Prairie Block Owner, LLC, 457 B.R. 692, 698 (Bankr. E.D. Ill. 2011) (because debtor's counterclaims for (1) rescission of contract and (2) breach of contractual duty of good faith and fair dealing have to be resolved in the determination of creditor's proof of claim based on the contract, they are core proceedings subject to final adjudication by the bankruptcy court).

Moreover, all of the parties involved in this claim (YSI, Waffle House, and Freeway Foods) have consented to the Court entering a final judgment. The Supreme Court has repeatedly recognized that  parties can agree to be bound by a decision of a court that may lack specific constitutional authority to make a final decision without their consent. See, e.g., Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 848-49 (1986) ("[A]s a personal right, Article III's guarantee of an impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights that dictate the procedures by which civil and criminal matters must be tried. Indeed, the relevance of concepts of waiver to Article III challenges is demonstrated by our decision in Northern Pipeline, in which the absence of consent to an initial adjudication before a non-Article III tribunal was relied on as a significant factor in determining that Article III forbade such adjudication."); MacDonald v. Plymouth Cnty. Trust Co., 286 U.S. 263, 267-68 (1932) (litigant consent converted an otherwise-plenary suit that could only be tried in a federal district court into a summary proceeding in which a referee could enter final judgment).[23]

---

[23]Professor Brubaker adds:

> Justice Brennan's plurality Marathon opinion, in describing the limits on 1898 Act summary jurisdiction of referees that the 1978 Reform Act exceeded, twice noted that with consent referees could hear and finally determine plenary suits, citing MacDonald v. Plymouth County Trust Co. Justice Rehnquist's concurrence repeatedly emphasized defendant Marathon's objection to the bankruptcy court

Although the <u>Blixseth</u> court found that the consent of the parties cannot authorize a bankruptcy court to enter a final judgment on a cause of action, <u>Samson v. Blixseth (In re Blixseth),</u> 2011 WL 3274042, at *12 (Bankr. D. Mont. Aug. 1, 20ll) ("[N]o provision allows parties to consent to a bankruptcy court making final decisions in core proceedings as 28 U.S.C. § 157(c)(2) allows parties to consent for non-core proceedings."), the overwhelming majority of courts have concluded that "the bankruptcy court has the authority to render final judgments even in non-core proceedings with the consent of the parties." <u>In re Pro-Pac, Inc.,</u> 456 B.R. 894, 902-03 (Bankr. E.D. Wis. 2011). <u>See also</u> <u>Mercury Cos., Inc. v. FNF Sec. Acquisition, Inc.,</u> -- F.Supp.2d –, 2011 WL 5127613, at *3 (D. Colo. Oct. 31, 2011) (The <u>Stern</u> "holding constitutes a clear rejection of Defendant's argument that one cannot consent to the authority (constitutional or otherwise) of the bankruptcy court to enter final orders and judgment in an adversary proceeding."); <u>Wilderness Crossings</u>, 2011 WL 5417098, at *1 ("parties may waive <u>Stern</u>-based objections, because such objections do not challenge the court's subject matter jurisdiction."); <u>In re Sunra Coffee LLC</u>, 2011 WL 4963155, at *5-6 (Bankr. D. Hawaii Oct. 18, 2011) ("While subject matter jurisdiction may not be conferred by consent . . . a party may waive its right to an Article III court.") (internal citations omitted); <u>GB Herndon</u>, 459 B.R. at 159 ("[U]nder the current bankruptcy system, a bankruptcy judge's hearing and determining a matter by the consent of the parties does not offend Article III."); <u>Oxford Expositions</u>, 2011 WL

deciding the action at issue as a determinative feature in the unconstitutionality of the bankruptcy court's judgment, and the dissents of both Chief Justice Burger (describing the holding of the Court) and Justice White also expressly stated their understanding that consent of the litigants to final adjudication in a non-Article III bankruptcy court would cure any unconstitutionality under the Court's holding, "just as [was the case] before the 1978 Act was adopted"
Brubaker, <u>Part II</u> at 14-15 (citations omitted).

4074028, at *8 ("[A] party can consent to the bankruptcy court's entering a final judgment in a non-core matter as contemplated by § 157(c)(2)."); <u>Safety Harbor Resort</u>, 456 B.R. at 704 ("Besides, parties can still consent—either expressly or impliedly—to a bankruptcy court's jurisdiction after <u>Stern</u>."); <u>Olde Prairie Block Owner</u>, 457 B.R. at 701 ("[I]t is well established 'that litigants may waive their personal right to have an Article III judge preside over a civil trial.'") (citing <u>Peretz v. U.S.</u>, 501 U.S. 923, 936 (1991)); <u>Teleservices Grp.</u>, 456 B.R. at 338 ("[C]ommon sense also suggests that if the parties before a district court may consent to binding arbitration as a form of alternative dispute resolution, then they certainly should be able to choose the bankruptcy judge as their arbiter if that is the alternative they prefer."); <u>Polaroid Corp.</u>, 451 B.R. at 498 ("If PNY does consent to entry of final judgment on Count II at the order of the bankruptcy judge, the final disposition of that count can be made at the bankruptcy court level . . .").

Thus, because it is necessary to decide this claim in order to allow or disallow the YSI proof of claim, and because the parties have consented, the Court may enter a final judgment regarding this claim.

### 2. <u>Declaration of Default Under Credit Agreement for Unauthorized Dividends, Conveyances, and/or Affiliate Transactions</u>

YSI and Waffle House allege that Freeway Foods defaulted under the SunTrust loan documents because it made unauthorized dividends, distributions, conveyances, and affiliate transactions. This claim is against Freeway Foods, the Flys, and the Fly Trusts. The Trustee argues that to the extent that this is a claim against the Freeway Foods estate, the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B), but as to the non-debtor defendants, the claim is non-core, so the Court may not enter a final judgment. The Flys, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court

28

may only submit proposed findings and conclusions.

This claim is claim against the estate, so 28 U.S.C. § 157(b)(2)(B) provides that it is a core proceeding. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law contract claim and does not stem from the Bankruptcy Code. However, since YSI filed a proof of claim for all sums due under the SunTrust loan documents, it will be necessary to determine if a default occurred under those documents in order to allow the YSI claim. The existence of a default is a prerequisite to the exercise of certain rights by a secured party, and the resolution of this claim will be necessary to a determination of the rights of the parties under the SunTrust debt and security documents. Therefore the second prong of the <u>Stern</u> test has been met, and the Court has the constitutional authority to enter a final judgment regarding this claim.

### 3. Declaration that Release Agreement Did Not Release Borrowers/Guarantors from Liability Under Credit Agreement

YSI and Waffle House allege that Freeway Foods, the Flys, and the Fly Trusts entered into a Release Agreement with SunTrust. They seek a declaratory judgment that the Release Agreement did not release Freeway Foods, the Flys, and the Fly Trusts from their obligations under the Credit Agreement. The Trustee argues that to the extent that this is a claim against the Freeway Foods estate, the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B), but as to the non-debtor defendants, the claim is non-core, so the Court may not enter a final judgment. The Flys, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings and conclusions.

This claim is claim against the estate, so it is a core proceeding. 28 U.S.C. § 157(b)(2)(B). It does not satisfy the first prong of the <u>Stern</u> test because it a state law contract claim and does not stem from the Bankruptcy Code. However, since YSI filed a proof of claim for all sums due under

the SunTrust loan documents, it will be necessary to determine if Freeways Foods is released by the Release Agreement, a finding that is likely to be determinative as to the Flys and the Fly Trusts as well. Therefore the second prong of the <u>Stern</u> test has been met, and the Court has the constitutional authority to enter a final judgment regarding this claim against Freeway Foods. With regard to the Flys and the Fly Trusts, the Court will submit proposed findings of fact and conclusions of law.

### 4. Breach of Revolving Credit Facility

YSI and Waffle House allege that Freeway Foods defaulted under the Revolving Credit Facility, which was assigned to YSI by SunTrust. They seek payment under the Revolving Credit Facility. The Trustee argues that this is a claim against the Freeway Foods estate, so the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B). The Flys assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings and conclusions. Waffle House, YSI, Kraft, and Rogers agree with the Trustee that this is a core claim.

This claim is a claim against the estate, so it is a core proceeding. 28 U.S.C. § 157(b)(2)(B). It does not satisfy the first prong of the <u>Stern</u> test because it is a state law contract claim and does not stem from the Bankruptcy Code. However, since YSI filed a proof of claim for all sums due under the SunTrust loan documents, it will be necessary to determine if Freeways Foods is liable to YSI under the Revolving Credit Facility in order for the Court to allow the YSI proof of claim. Therefore the second prong of the <u>Stern</u> test has been met, and the Court has the constitutional authority to enter a final judgment regarding this claim. In addition, the parties have consented.

### 5. Breach of Guaranty Regarding Revolving Credit Facility

YSI and Waffle House allege that the Flys and the Fly Trusts guaranteed repayment of the

Revolving Credit Facility. They seek payment under the Guaranty. The Trustee, the Flys, and the Fly Trusts argue that this is a claim against non-debtors, so the Court has no authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2). Waffle House, YSI, Kraft, and Rogers assert that this is a core claim because it must be determined as part of the claims allowance process.

This claim is not a claim against the estate, so it is not a core proceeding. See 28 U.S.C. § 157(b)(2). Nor is it necessary to determine the liability of these non-debtors in the claims allowance process. Although the Flys filed individual claims against the estate for wages, salaries, and other compensation, the allowance of such claims will not require a determination of their liability under their Guaranty.[24]  Because this claim is a non-core, "related to" proceeding, it is not necessary to apply the Stern test. The Court will issue proposed findings of fact and conclusions of law regarding this claim.[25]

---

[24] See In re Ortiz, -- F.3d --, 2011 WL 6880651 at *6 (7th Cir. Dec. 30, 2011) (filing proof of claim for medical services that revealed debtor's medical information did not allow bankruptcy court to enter final order on debtor's counterclaim that creditor violated state law because adjudicating creditor's claims did not require court to determine debtor's counterclaim); In re AIH Acquisitions, LLC, 2011 WL 4000894, at *3 (N.D. Tex. Sept. 7, 2011) (bankruptcy court could not enter final judgment on causes of action asserted by buyer of estate assets against lender that arose post-petition for fraudulent inducement and negligent misrepresentation because (1) they are state law counterclaims and (2) the court need not determine such claims in allowing buyer's proof of claim); Olde Prairie Block Owner, 457 B.R. at 699 (debtor's counterclaims did not need to be decided to rule on creditor's proof of claim, so they are not subject to final adjudication by the bankruptcy court); In re Sw. Sports Ctr., Inc., 2011 WL 4002559, at *7 (Bankr. N.D. Ohio Sept. 6, 2011) ("In this case, Kleem filed a proof of claim based on the judgment lien filed in the Cuyahoga County Records Office. The debtor filed its Adversary Proceeding alleging fraud, conspiracy and negligence-all state court claims alleged in the second state court case. The Bankruptcy Court's ruling on Kleem's proof of claim will not resolve the debtor's counterclaim. Thus this Court has no authority under the U.S. Constitution to enter a final judgment.").

[25] While at least one bankruptcy court has determined that it has "no statutory authority to render findings of fact and conclusions of law for core proceedings that it may not constitutionally hear," Blixseth, 2011 WL 3274042, at *12, this Court will join the majority of courts that have concluded that Stern did not eliminate the ability of bankruptcy courts to issue such proposed findings and conclusions. See In re El-Atari, 2011 WL 5828013, at *3 (E.D. Va.

**6. Contractual Attorneys' Fees Regarding Revolving Credit Facility**

YSI and Waffle House allege that Freeway Foods, the Flys, and the Fly Trusts entered into

the Credit Agreement and thereby agreed to pay reasonable attorneys fees if the indebtedness

Nov. 18, 2011) ("Even if a fraudulent conveyance action . . . has lost its vaunted status as a core proceeding, it is clearly 'related to a case under title 11.' As such, the bankruptcy court retains the authority to 'submit proposed findings of fact and conclusions of law' that the district court then considers before entering a final judgment. § 157(c)(1)."); Field v. Lindell ( In re Mortg. Store, Inc.), 2011 WL 5056990, at *5–6 (D. Hawai'i Oct.5, 2011) ("[T]he court has little difficulty in finding that Congress, if faced with the prospect that bankruptcy courts could not enter final judgments on certain 'core' proceedings, would have intended them to fall within 28 U.S.C. § 157(c)(1) granting bankruptcy courts authority to enter findings and recommendations."); Paloian v. Am. Express Co. (In re Canopy Fin., Inc.), 2011 WL 3911082, at *3-4 (N.D. Ill. Sept. 1, 2011) ("[T]he [Stern] Court at least implied that the effect of its decision was to 'remove' certain claims from 'core bankruptcy jurisdiction,' and to relegate them to the category of claims that are merely 'related to' bankruptcy proceedings and thus subject to being heard, but not finally decided, by bankruptcy courts."); In re Byce, 2011 WL 6210938, at *4 (D. Idaho Dec. 14, 2011) ("A majority of district courts considering the issue hold that the bankruptcy courts retain the power to enter proposed findings and recommendations."); In re Republic Windows & Doors, LLC, – B.R. –, 2011 WL 6157342 (Bankr. N.D. Ill. Dec. 12, 2011) ("Nothing in [the Stern] decision can be read to preclude this Court from submitting proposed findings of fact and conclusions of law to the district court."); In re D & B Swine Farms, Inc., 2011 WL 6013218, at *2 (Bankr. E.D.N.C. Dec. 2, 2011) (rejecting Blixseth holding that bankruptcy court has no statutory authority to render proposed findings and conclusions); Soporex, 2011 WL 5911674, at *5 ("Stern did not strip the bankruptcy courts of the authority to hear these types of claims and to propose findings of fact and conclusions of law to the district court for de novo review."); In re Universal Mktg., Inc., 459 B.R. 573 , 578 (Bankr. E.D. Pa. 2011) ("Respectfully, I believe Blixseth is incorrect and I decline to follow it."); In re Bujak, 2011 WL 5326038, at *4 (Bankr. D. Idaho Nov. 3, 2011) ("The majority in Stern expressly noted that the creditor in that case had not argued that bankruptcy courts are barred from hearing all counterclaims against a creditor, nor from entering proposed findings and conclusions on such matters, which could then be submitted to a district court to 'finally decide' the issues.") (citing Stern, 132 S.Ct. at 2620); In re Heller Ehrman LLP, 2011 WL 4542512, at *6 (Bankr. N.D. Cal. Sept. 28, 2011) ("[T]he fact that Bankruptcy Rule 9033 only mentions non-core proceedings in no way prohibits following the same procedure in core matters."). Recently the Blixseth court amended its earlier ruling. In re Blixseth, 2012 WL 10193, at *8-10 (Bankr. D. Mont. Jan. 3, 2012) ("The Court sua sponte amends its August 1, 2011, Memorandum of Decision and Order. . . . [S]everal courts have recently concluded that Stern v. Marshall does not deprive bankruptcy courts of subject matter jurisdiction. . . . [B]ecause the United States District Court for the District of Montana would have the requisite subject-matter jurisdiction to adjudicate the claims in this Adversary Proceeding, so too does this Court.").

evidenced by the Revolving Credit Facility is collected by an attorney. They seek a declaratory judgment that Freeway Foods, the Flys, and the Fly Trusts are liable for attorneys' fees. The Trustee argues that to the extent that this is a claim against the Freeway Foods estate, the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B), but as to the non-debtor defendants, the claim is non-core, so the Court may not enter a final judgment. The Flys and the Fly Trusts assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings and conclusions. Waffle House, YSI, Kraft, and Rogers argue that this is a core claim because it must be determined as part of the claims allowance process.

This claim is a claim against the estate, so it is a core proceeding. 28 U.S.C. § 157(b)(2)(B). It does not satisfy the first prong of the <u>Stern</u> test because it is a state law contract claim and does not stem from the Bankruptcy Code. However, since YSI filed a proof of claim for all sums due under the SunTrust loan documents, it will be necessary to determine if Freeways Foods is liable for attorneys' fees pursuant to the Credit Agreement, a finding that is likely to be determinative as to the Flys and the Fly Trusts as well. Therefore the second prong of the <u>Stern</u> test has been met, and the Court has the constitutional authority to enter a final judgment regarding this claim against Freeway Foods. With regard to the Flys and the Fly Trusts, the Court will submit proposed findings of fact and conclusions of law.

### 7. Breach of Term Note

YSI and Waffle House allege that Freeway Foods defaulted under the Term Note, which was assigned to YSI by SunTrust. They seek payment under the Term Note. The Trustee argues that this is a claim against the Freeway Foods estate, so the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B). The Flys assert that this claim is "related to" the Freeway

Foods bankruptcy, so the Court may only submit proposed findings and conclusions. Waffle House, YSI, Kraft, and Rogers agree with the Trustee that this is a core claim.

This claim is a claim against the estate, so it is a core proceeding. 28 U.S.C. § 157(b)(2)(B). It does not satisfy the first prong of the <u>Stern</u> test because it is a state law contract claim and does not stem from the Bankruptcy Code. However, since YSI filed a proof of claim for all sums due under the SunTrust loan documents, it will be necessary to determine if Freeways Foods is liable to YSI under the Term Note in order for the Court to allow or disallow the YSI proof of claim. Therefore the second prong of the <u>Stern</u> test has been met, and the Court has the constitutional authority to enter a final judgment regarding this claim. In addition, the parties have consented.

### 8. Breach of Guarantee Regarding Term Note

YSI and Waffle House allege that the Flys and the Fly Trusts guaranteed repayment of the Term Note. They seek payment under the Guaranty. The Trustee, the Flys, and the Fly Trusts argue that this is a claim against non-debtors, so the Court has no authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2). Waffle House, YSI, Kraft, and Rogers assert that this is a core claim because it must be determined as part of the claims allowance process.

This claim is not a claim against the estate, so it is not a core proceeding. <u>See</u> 28 U.S.C. § 157(b)(2). Nor is it necessary to determine the liability of these non-debtors in the claims allowance process. Although the Flys filed individual claims against the estate, the allowance of such claims will not require a determination of their liability under their Guaranty. Because this claim is a non-core, "related to" proceeding, it is not necessary to apply the <u>Stern</u> test. The Court will issue proposed findings of fact and conclusions of law regarding this claim.

### 9. Contractual Attorneys' Fees Regarding Term Note

34

YSI and Waffle House allege that Freeway Foods, the Flys, and the Fly Trusts entered into the Credit Agreement and thereby agreed to pay reasonable attorneys' fees if the indebtedness evidenced by the Term Note is collected by an attorney. They seek a declaratory judgment that Freeway Foods, the Flys, and the Fly Trusts are liable for attorneys' fees. The Trustee argues that to the extent that this is a claim against the Freeway Foods estate, the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B), but as to the non-debtor defendants, the claim is non-core, so the Court may not enter a final judgment. The Flys and the Fly Trusts assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings and conclusions. Waffle House, YSI, Kraft, and Rogers argue that this is a core claim because it must be determined as part of the claims allowance process.

This claim is a claim against the estate, so it is a core proceeding. 28 U.S.C. § 157(b)(2)(B). It does not satisfy the first prong of the <u>Stern</u> test because it is a state law contract claim and does not stem from the Bankruptcy Code. However, since YSI filed a proof of claim for all sums due under the SunTrust loan documents, it will be necessary to determine if Freeways Foods is liable for attorneys' fees pursuant to the Credit Agreement, a finding that is likely to be determinative as to the Flys and the Fly Trusts as well. Therefore the second prong of the <u>Stern</u> test has been met, and the Court has the constitutional authority to enter a final judgment regarding this claim against Freeway Foods. With regard to the Flys and the Fly Trusts, the Court will submit proposed findings of fact and conclusions of law.

**10. Breach of Security Agreement**

YSI and Waffle House allege that Freeway Foods defaulted under the Security Agreement, which was assigned to YSI by SunTrust. They allege that Freeway Foods failed to deliver to YSI

35

proceeds from the sale of collateral. YSI and Waffle House seek injunctive relief to enforce the terms of the Security Agreement. The Trustee argues that this is a claim against the Freeway Foods estate, so the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B). The Flys assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings and conclusions. Waffle House, YSI, Kraft, and Rogers agree with the Flys that this is not a core claim.

This claim is claim against the estate, so it is a core proceeding. 28 U.S.C. § 157(b)(2)(B). It does not satisfy the first prong of the Stern test because it is a state law contract claim and does not stem from the Bankruptcy Code. However, since YSI filed a proof of claim for all sums due under the SunTrust loan documents, it will be necessary to determine if Freeways Foods breached the Security Agreement in order for the Court to allow or disallow the YSI proof of claim (or to provide injunctive relief). Therefore the second prong of the Stern test has been met, and the Court has the constitutional authority to enter a final judgment regarding this claim. In addition, the parties have consented.

## 11. Violation of Uniform Fraudulent Transfer Act

YSI and Waffle House allege that Freeway Foods transferred $225,000.00 to Reames Development, L.L.C. and $447,000 to unknown entities, constituting fraudulent transfers pursuant to state law. YSI and Waffle House seek injunctive relief, avoidance of the transfers, an accounting, compensatory damages, and punitive damages.[26] The Trustee argues that this is a claim against the Freeway Foods estate, so the Court has the authority to enter a final judgment pursuant to 28 U.S.C.

---

[26]Since the recipients of these alleged fraudulent transfers are not named defendants, the Court questions whether all of the necessary parties have been named. See In re H. King & Assoc., 295 B.R. 246, 293 (Bankr. N.D. Ill. 2003); In re Halpert & Co., Inc., 254 B.R. 104, 116 (Bankr. D.N.J. 1999). But that is an issue for another day.

§ 157(b)(2)(B). The Flys assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings and conclusions. Waffle House, YSI, Kraft, and Rogers agree with the Flys that this is not a core claim.

This claim is claim against the estate, so 28 U.S.C. § 157(b)(2)(B) indicates that it is a core proceeding. 28 U.S.C. § 157(b)(2)(H) also indicates that it is a core proceeding.[27] But it does not satisfy the first prong of the <u>Stern</u> test because it is based on state fraudulent transfer law[28] and does not stem from the Bankruptcy Code. Although YSI and Waffle House have filed proofs of claim, as described above, it is not necessary to determine if Freeways Foods fraudulently transferred assets in order for the Court to allow the YSI and Waffle House proofs of claim. Therefore, absent consent, the Court has no constitutional authority to enter a final judgment regarding this claim. However, the parties have consented, so the Court may enter a final judgment.

### 12. Attorneys' Fees Pursuant to Security Agreement

YSI and Waffle House allege that Freeway Foods entered into the Security Agreement, whereby it agreed to pay reasonable attorneys fees incurred by SunTrust (now YSI) in connection with the exercise of its rights and remedies under the Security Agreement. They seek a declaratory judgment that Freeway Foods is liable for such attorneys' fees. The Trustee argues that this is a claim against the Freeway Foods estate, so the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B). The Flys assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings and conclusions. Waffle House, YSI, Kraft, and Rogers agree with the Trustee that this is a core claim.

---

[27] "Core proceedings include, but are not limited to–(H) proceedings to determine, avoid, or recover fraudulent conveyances." 28 U.S.C. § 157(b)(2)(H).

[28] Both Georgia and North Carolina have codified the Uniform Fraudulent Transfer Act. <u>See</u> N.C. GEN. STAT. § 39-23 <u>et seq.</u>; GA. STAT. § 18-2-71 <u>et seq.</u>

This claim is a claim against the estate, so it is a core proceeding. 28 U.S.C. § 157(b)(2)(B). It does not satisfy the first prong of the <u>Stern</u> test because it is a state law contract claim and does not stem from the Bankruptcy Code. However, since YSI filed a proof of claim for all sums due under the SunTrust loan documents, it will be necessary to determine if Freeways Foods is liable for the attorneys' fees of YSI in order for the Court to allow or disallow the YSI proof of claim. Therefore the second prong of the <u>Stern</u> test has been met, and the Court has the constitutional authority to enter a final judgment regarding this claim. In addition, the parties have consented.

**13. Defamation**

YSI and Waffle House allege that Freeway Foods, the Flys, and the Fly Trusts made false statements that defamed them. They seek compensatory and punitive damages for alleged wrongful conduct. The Trustee argues that to the extent that this is a claim against the Freeway Foods estate, the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B), but as to the non-debtor defendants, the claim is non-core, so the Court may not enter a final judgment. The Flys, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings and conclusions.

Pursuant to 28 U.S.C. § 157(b)(2)(B), the defamation claim is a core proceeding because it is a claim against the estate. Defamation claims, however, constitute personal injury tort claims within the meaning of 28 U.S.C. § 157(b)(5).[29] <u>In re Arnold</u>, 407 B.R. 849, 853 (Bankr. M.D.N.C.

---

[29]"The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending."  28 U.S.C. § 157(b)(5).

2009).  Since <u>Stern</u> determined that  28 U.S.C. § 157 is procedural and not jurisdictional, <u>Stern</u>, 131

S.Ct. at 2607, its requirements can be waived. YSI, Waffle House, and Freeway Foods have

consented to the Court entering a final judgment on this claim, but the Flys and the Fly Trusts have

not.  Section 157(b)(5) "unequivocally states that the forum for <u>trying</u> a personal injury tort or

wrongful death claim is limited to the district court."  <u>In re Chateaugay Corp.</u>, 111 B.R. 67, 76

(Bankr. S.D.N.Y. 1990) (emphasis in original).  However, "there is no such proscription for

summarily disposing of claims which have no basis in law, for instance, pursuant to 12(b)(6) or 56

of the Federal Rules of Civil Procedure . . . where a trial would not be necessary."  <u>Id.</u>  Furthermore,

Bankruptcy courts are not divested of pretrial jurisdiction over matters which they ultimately may

be unable to decide. <u>Freeway Foods of Greensboro</u>, 449 B.R. at 890 n.6 (collecting cases).  Since

the Flys and the Fly Trusts have not consented to this Court's authority to finally resolve the

defamation claim against them, under the plain language of Section 157(b)(5) any trial of the claim

against them must proceed in the district court.  Irrespective of the parties' consent, however, this

Court has authority to preside over the claim and adjudicate motions, including dispositive motions,

until it is ready for trial.  <u>See</u> <u>Thomason Auto Grp., LLC v. Ferla</u>, 2009 WL 3491163, at *6 (D.N.J.

Oct. 23, 2009) ("[E]ven when a district court must ultimately preside over a trial by jury, there is

no reason why the Bankruptcy Court may not preside over [an] adversary proceeding and adjudicate

discovery disputes and motions only until such time as the case is ready for trial.") (quoting <u>In re</u>

<u>Chet Decker, Inc.</u>, 2006 WL 3019663, at *8 (D.N.J. Oct. 23, 2006)). Once dispositive motions have

been adjudicated and the claim is ready for trial, unless there is unanimous consent among the

parties for this Court to conduct the trial, withdrawal of the reference to the district court would be

appropriate.  <u>GulfMark Offshore, Inc. v. Bender Shipbuilding & Repair Co., Inc.</u>, 2009 WL

3756708, at *4 n.9 (S.D. Ala. Nov. 9, 2009).

With this in mind, the Court must now determine whether it has the authority to enter final judgments on this claim in the context of any pretrial motions that may come before it. The defamation claim does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. Although YSI and Waffle House have filed proofs of claim, it is not necessary to determine if Freeways Foods defamed YSI amd Waffle House in order for the Court to allow the YSI and Waffle House proofs of claim. Moreover, while YSI, Waffle House, and Freeway Foods have consented to the Court entering a final judgment regarding this claim, the Flys and the Fly Trusts have not. Therefore, with regard to any motions that may arise before trial,  the Court will enter a final judgment with regard to Freeway Foods, but will submit proposed findings and conclusions regarding the Flys and the Fly Trusts.

### **14. Attorneys' Fees for Bad Faith and Stubborn Litigiousness**

YSI and Waffle House allege that Freeway Foods, the Flys, and the Fly Trusts have acted in bad faith and have been "stubbornly litigious." They seek attorneys' fees and expenses for such alleged wrongful conduct. The Trustee argues that to the extent that this is a claim against the Freeway Foods estate, the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B), but as to the non-debtor defendants, the claim is non-core, so the Court may not enter a final judgment. The Flys assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings and conclusions. Waffle House, YSI, Kraft, and Rogers agree with the Trustee that this is a core claim.

This claim is a claim against the estate, so it is a core proceeding. 28 U.S.C. § 157(b)(2)(B). It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not

stem from the Bankruptcy Code. Although YSI and Waffle House have filed proofs of claim, as described above, it is not necessary to determine if Freeways Foods has been stubbornly litigious in order for the Court to allow the YSI and Waffle House proofs of claim. YSI, Waffle House, and Freeway Foods have consented to the Court entering a final judgment regarding this claim, but the Flys and the Fly Trusts have not. Therefore, the Court will enter a final judgment with regard to Freeway Foods, but will submit proposed findings and conclusions regarding the Flys and the Fly Trusts.

**C.      Freeway Foods' Counterclaims**

In their First Amended Counterclaim and Third Party Complaint, Freeway Foods and Gary Fly asserted counterclaims against YSI and Waffle House and a third party complaint against Rogers and Kraft. The Court will consider the claims in the First Amended Counterclaim and Third Party Complaint and determine, pursuant to <u>Stern</u>, whether it can enter a final judgment regarding such claims.

**1. Declaratory Judgment that Freeway Foods is Not in Default to YSI**

Freeway Foods seeks a declaratory judgment against YSI that it is not in default under the SunTrust loan documents, including the Credit Agreement and the Security Agreement. The Trustee argues that this is a core proceeding because it necessarily involves the allowance or disallowance of the YSI claim against the Freeway Foods bankruptcy estate. Waffle House, YSI, Kraft, and Rogers agree with the Trustee. Mr. Fly asserts that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings of fact and conclusions of law.

This claim is a counterclaim by the estate against YSI, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u>

41

test because it is a state law contract claim and does not stem from the Bankruptcy Code.  But since YSI filed a proof of claim for all sums due under the SunTrust loan documents, it will be necessary to determine if a default occurred under those documents in order to allow the YSI claim. Therefore the second prong of the <u>Stern</u> test has been met, and the Court has the constitutional authority to enter a final judgment regarding this claim.  Also, Freeway Foods and YSI have consented.

## 2. Declaratory Judgment that Freeway Foods is Not in Default to Waffle House

Freeway Foods seeks a declaratory judgment against Waffle House that it is not in default under the Franchise Agreement. The Trustee argues that this is a core proceeding because it necessarily involves the allowance or disallowance of the Waffle House claim against the Freeway Foods bankruptcy estate. Mr. Fly, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings of fact and conclusions of law.

This claim is a counterclaim by the estate against Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings.  It does not satisfy the first prong of the <u>Stern</u> test because it is a state law contract claim and does not stem from the Bankruptcy Code.  <u>See</u> <u>Gecker v. Flynn (In re Emerald Casino, Inc.)</u>, 459 B.R. 298, 301 (Bankr. N.D. Ill. 2011) (trustee's counterclaims were not core proceedings); <u>Polaroid Corp.</u>, 451 B.R. at 496 (trustee's breach of contract claims against creditor were not core proceedings).  But since Waffle House filed a proof of claim for, among other things, sums due under the Franchise Agreement, it will be necessary to determine if a default occurred under the Franchise Agreement in order to allow the Waffle House claim.  Therefore the second prong of the <u>Stern</u> test has been met, and the Court has the constitutional authority to enter a final judgment regarding this claim.  Also, Freeway Foods and

Waffle House have consented.

### 3. Declaratory Judgment Regarding Value of Surrendered Assets

Freeways Foods seeks a declaratory judgment against YSI and Waffle House that the value of the restaurants it surrendered as part of YSI's alleged wrongful foreclosure exceeded $6.5 million and that the foreclosure was a sham. Freeway Foods alleges that it overpaid YSI and is entitled to a refund. The Trustee argues that this is a core proceeding because it necessarily involves the allowance or disallowance of the YSI proof of claim. Waffle House, YSI, Kraft, and Rogers agree with the Trustee. Mr. Fly asserts that this claim is "related to" the Freeway Foods bankruptcy.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. In order to allow the YSI and Waffle House claims, it will be necessary to determine (1) if Freeway Foods breached the loan documents that gave rise to the alleged "sham" foreclosure and (2) the value of the foreclosed assets. Therefore the second prong of the <u>Stern</u> test has been met, and the Court has the constitutional authority to enter a final judgment regarding this claim. Also, Freeway Foods, YSI, and Waffle House have consented.

### 4. Commercially Unreasonable Sale

Freeways Foods seeks a declaratory judgment against YSI and Waffle House that the foreclosure sale conducted by YSI and/or Waffle House was commercially unreasonable in violation of Georgia law. The Trustee argues that this is a core proceeding because it necessarily involves the allowance or disallowance of the YSI and Waffle House proofs of claim. Waffle House, YSI, Kraft, and Rogers agree with the Trustee. Mr. Fly asserts that this claim is "related to" the Freeway Foods

43

bankruptcy.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. In order to allow the YSI and Waffle House claims, it will be necessary to determine if Freeway Foods breached the loan documents that gave rise to the foreclosure, but it will not be necessary to determine whether the foreclosure was commercially unreasonable. However, Freeway Foods, YSI, and Waffle House have consented, so the Court has the constitutional authority to enter a final judgment regarding this claim.

### 5. Wrongful Foreclosure

Freeways Foods seeks a declaratory judgment against YSI and Waffle House that the foreclosure sale conducted by YSI and/or Waffle House was not conducted in good faith and was therefore wrongful. The Trustee argues that this is a core proceeding because it necessarily involves the allowance or disallowance of the YSI and Waffle House proofs of claim. Waffle House, YSI, Kraft, and Rogers agree with the Trustee. Mr. Fly asserts that this claim is "related to" the Freeway Foods bankruptcy.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. In order to allow the YSI and Waffle House claims, it will be necessary to determine if Freeway Foods breached the loan documents that gave rise to the foreclosure, but it will not be necessary to determine whether the foreclosure was wrongful. However, Freeway Foods, YSI, and

44

Waffle House have consented, so the Court has the constitutional authority to enter a final judgment regarding this claim.

### 6. Unjust Enrichment

Freeways Foods seeks a declaratory judgment against YSI and Waffle House for unjust enrichment. Freeway Foods alleges that the assets seized by YSI and Waffle House had a value greater than the amount due under the SunTrust loan documents. The Trustee argues that this is a core proceeding because it necessarily involves the allowance or disallowance of the YSI and Waffle House proofs of claim. Waffle House, YSI, Kraft, and Rogers agree with the Trustee. Mr. Fly asserts that this claim is "related to" the Freeway Foods bankruptcy.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the Stern test because it is a state law tort claim and does not stem from the Bankruptcy Code. In order to allow the YSI and Waffle House claims, it will be necessary to determine if Freeway Foods breached the loan documents that gave rise to the foreclosure, but it will not be necessary to determine whether YSI and Waffle House were unjustly enriched. However, Freeway Foods, YSI, and Waffle House have consented, so the Court has the constitutional authority to enter a final judgment regarding this claim.

### 7. Tortious Interference With Prospective Business Advantage

Freeways Foods seeks a declaratory judgment against YSI and Waffle House for tortious interference with the economic advantages that Freeway Foods enjoyed with its landlords. The Trustee argues that this is a core proceeding because it necessarily involves the allowance or disallowance of the YSI and Waffle House proofs of claim. Waffle House, YSI, Kraft, and Rogers

45

agree with the Trustee. Mr. Fly asserts that this claim is "related to" the Freeway Foods bankruptcy.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. In order to allow the YSI and Waffle House claims, it will be necessary to determine if Freeway Foods breached the loan documents that gave rise to the foreclosure, but it will not be necessary to determine whether YSI and Waffle House tortuously interfered with the business relationship between Freeway Foods and its landlords. However, Freeway Foods, YSI, and Waffle House have consented, so the Court has the constitutional authority to enter a final judgment regarding this claim.

### 8. Breach of Covenant of Good Faith and Fair Dealing

Freeways Foods seeks a declaratory judgment against YSI and Waffle House for breach of the covenant of good faith and fair dealing. The Trustee argues that this is a core proceeding because it necessarily involves the allowance or disallowance of the YSI and Waffle House proofs of claim. Mr. Fly, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. It will not be necessary to determine whether YSI and Waffle House breached the covenant of good faith and fail dealing in order to allow the YSI and Waffle House claims. However, Freeway Foods, YSI, and Waffle House have consented, so the Court has the constitutional authority to enter

a final judgment regarding this claim.

### 9. Breach of Compromise or Settlement Contract

Freeways Foods seeks an order directing YSI and Waffle House to specifically perform an alleged settlement agreement involving the obligations of Freeway Foods to YSI and Waffle House. The Trustee argues that this is a core proceeding because it necessarily involves the allowance of the YSI and Waffle House proofs of claim. Mr. Fly, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the Stern test because it is a state law tort claim and does not stem from the Bankruptcy Code. It is necessary to determine (1) whether such a settlement agreement existed and (2) whether YSI and Waffle House breached the settlement agreement in order to allow the YSI and Waffle House claims. Also, Freeway Foods, YSI, and Waffle House have consented, so the Court has the constitutional authority to enter a final judgment regarding this claim.

### 10. Promissory Estoppel

Freeways Foods seeks an order directing YSI and Waffle House to specifically perform an alleged promise involving the obligations of Freeway Foods to YSI and Waffle House pursuant to the SunTrust loan documents. The Trustee argues that this is a core proceeding because it necessarily involves the allowance or disallowance of the YSI and Waffle House proofs of claim. Mr. Fly, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. §

47

157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. It is necessary to determine (1) whether such a promise was made, (2) whether Freeway Foods reasonably relied upon it, and (3) whether Freeway Foods is entitled to specific performance of the promise in order to allow the YSI and Waffle House claims. Also, Freeway Foods, YSI, and Waffle House have consented, so the Court has the constitutional authority to enter a final judgment regarding this claim.

### 11. Breach of Accounting Services Agreement

Freeway Foods seeks damages from Waffle House for the alleged breach of an accounting services agreement. The Trustee argues that this is a core proceeding because it necessarily involves the allowance or disallowance of the Waffle House claim. Mr. Fly, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings of fact and conclusions of law.

This claim is a counterclaim by the estate against Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law contract claim and does not stem from the Bankruptcy Code. But since Waffle House filed a proof of claim for bookkeeping services, among other things, it will be necessary to determine if a default occurred under the accounting services agreement to allow the Waffle House claim. Therefore, pursuant to <u>Stern</u>, the Court has the constitutional authority to enter a final judgment regarding this claim. Also, Freeway Foods and Waffle House have consented.

### 12. Conversion of Securities Account

48

Freeway Foods and Mr. Fly[30] seek damages from YSI and Waffle House for the alleged conversion of a collateral securities account. The Trustee argues that this is a core proceeding because it necessarily involves the allowance of the YSI and Waffle House claims. Waffle House, YSI, Kraft, and Rogers agree with the Trustee. Mr. Fly asserts that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings of fact and conclusions of law.

This claim is a counterclaim by the estate and Mr. Fly against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. In order to allow the YSI and Waffle House claims, it will be necessary to determine (1) if Freeway Foods breached the SunTrust loan documents and (2) whether YSI and Waffle House had the right to seize control of the account. Therefore, pursuant to <u>Stern</u>, the Court has the constitutional authority to enter a final judgment for Freeway Foods regarding this claim. Because Mr. Fly did not consent, the Court will propose findings and conclusions for him regarding this claim.

### 13. Conversion of Cash

Freeway Foods seeks damages from YSI and Waffle House for the alleged conversion of its cash. The Trustee argues that this is a core proceeding because it necessarily involves the allowance of the YSI and Waffle House claims. Waffle House, YSI, Kraft, and Rogers agree with the Trustee. Mr. Fly asserts that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only

---

[30]The body of the complaint asserts that the Flys owned the account and that they both were damaged, but the prayer for relief requests damages for Mr. Fly only. <u>See</u> Plaintiff's Complaint, ¶¶ 197-200.

49

submit proposed findings of fact and conclusions of law.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. In order to allow the YSI and Waffle House claims, it will be necessary to determine (1) if Freeway Foods breached the SunTrust loan documents and (2) whether YSI and Waffle House had the right to seize control of the cash of Freeway Foods. Therefore, pursuant to <u>Stern</u>, the Court has the constitutional authority to enter a final judgment regarding this claim. Also, Freeway Foods, YSI, and Waffle House have consented.

### 14. Fraud

Freeway Foods seeks damages from YSI, Waffle House, Rogers, and Kraft for their alleged fraud, including fraudulent misrepresentations. The Trustee argues that to the extent that this is a claim against the Freeway Foods estate, the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B), but as to the third party claims against Rogers and Kraft, the claim is non-core, so the Court may not enter a final judgment. Mr. Fly, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings of fact and conclusions of law.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. It will not be necessary to determine whether YSI, Waffle House, Rogers, or Kraft committed fraud in dealing with Freeway Foods in order to allow the YSI and Waffle House claims. However,

50

Freeway Foods, YSI, Waffle House, Rogers, and Kraft have consented, so the Court has the constitutional authority to enter a final judgment regarding this claim.

### 15. Unfair and Deceptive Trade Practices

Freeway Foods seeks damages from YSI, Waffle House, Rogers, and Kraft for their alleged unfair trade practices pursuant to North Carolina law. The Trustee argues that to the extent that this is a claim against the Freeway Foods estate, the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B), but as to the third party claims against Rogers and Kraft, the claim is non-core, so the Court may not enter a final judgment. Mr. Fly, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings of fact and conclusions of law.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the Stern test because it is a state law tort claim and does not stem from the Bankruptcy Code. It will not be necessary to determine whether the actions of YSI, Waffle House, Rogers, and Kraft constitute an unfair trade practice in order to allow the YSI and Waffle House claims. However, Freeway Foods, YSI, Waffle House, Rogers, and Kraft have consented, so the Court has the constitutional authority to enter a final judgment regarding this claim.

### 16. Conspiracy

Freeway Foods seeks a declaratory judgment that YSI and Waffle House conspired to wrongfully take control of the franchises of Freeway Foods. The Trustee argues that this is a core proceeding because it necessarily involves the allowance of the Waffle House claim. Mr. Fly, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy,

51

so the Court may only submit proposed findings of fact and conclusions of law.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. It will not be necessary to determine whether YSI, Waffle House, Rogers, and Kraft conspired to wrongfully take control of the franchises of Freeway Foods in order to allow the YSI and Waffle House claims. However, Freeway Foods, YSI, and Waffle House have consented, so the Court has the constitutional authority to enter a final judgment regarding this claim.

### 17. Alter Ego

Freeway Foods seeks a declaratory judgment that the corporate form of YSI and Waffle House should be disregarded because they are alter egos of each other. The Trustee argues that this is a core proceeding because it necessarily involves the allowance of the Waffle House claim. Mr. Fly, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings of fact and conclusions of law.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. It will not be necessary to determine whether YSI and Waffle House are alter egos of each other in order to allow the YSI and Waffle House claims. However, Freeway Foods, YSI, and Waffle House have consented, so the Court has the constitutional authority to enter a final judgment regarding this claim.

### 18. Punitive Damages

Freeway Foods seeks punitive damages from YSI, Waffle House, Rogers, and Kraft for their "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which could raise the presumption of conscious indifference to consequences." The Trustee argues that to the extent that this is a claim against the Freeway Foods estate, the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B), but as to the third party claims against Rogers and Kraft, the claim is non-core, so the Court may not enter a final judgment. Mr. Fly, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy, so the Court may only submit proposed findings of fact and conclusions of law.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. It will not be necessary to determine whether YSI, Waffle House, Rogers, or Kraft are liable for punitive damages in order to allow the YSI and Waffle House claims. However, Freeway Foods, YSI, Waffle House, Rogers, and Kraft have consented, so the Court has the constitutional authority to enter a final judgment regarding this claim.

### **19. Attorneys' Fees**

Freeway Foods seeks the recovery of attorneys' fees and expenses from YSI, Waffle House, Rogers, and Kraft for their alleged bad faith and stubborn litigiousness. The Trustee argues that to the extent that this is a claim against the Freeway Foods estate, the Court has the authority to enter a final judgment pursuant to 28 U.S.C. § 157(b)(2)(B), but as to the third party claims against Rogers and Kraft, the claim is non-core, so the Court may not enter a final judgment. Mr. Fly, Waffle House, YSI, Kraft, and Rogers assert that this claim is "related to" the Freeway Foods bankruptcy,

53

so the Court may only submit proposed findings of fact and conclusions of law.

This claim is a counterclaim by the estate against YSI and Waffle House, and 28 U.S.C. § 157(b)(2)(C) provides that such counterclaims are core proceedings. It does not satisfy the first prong of the <u>Stern</u> test because it is a state law tort claim and does not stem from the Bankruptcy Code. It will not be necessary to determine whether YSI, Waffle House, Rogers, or Kraft are liable for attorneys' fees and expenses for bad faith and litigiousness in order to allow the YSI and Waffle House claims. However, Freeway Foods, YSI, Waffle House, Rogers, and Kraft have consented, so the Court has the constitutional authority to enter a final judgment regarding this claim.

## IV. CONCLUSION

The Court can enter final judgments in all of the causes of action asserted by YSI and Waffle House against Freeway Foods in the Third Amended Complaint. The Court will submit proposed findings of fact and conclusions of law in the third, fifth, sixth, ninth, thirteenth, and fourteenth causes of action asserted by YSI and Waffle House against the Flys and the Fly Trusts. The Court can enter final judgments in all of the causes of action asserted by Freeway Foods in the First Amended Counterclaim and Third Party Complaint. With regard to Mr. Fly, the Court will submit proposed findings of fact and conclusions of law in the twelfth counterclaim against YSI and Waffle House.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| FREEWAY FOODS OF GREENSBORO, INC. | ) ) | Case No. 10-11282 |
| | ) | Chapter 7 |
|     Debtor. | ) | |
| _____ | ) | |
| | ) | |
| YELLOW SIGN, INC., a Delaware Corporation, and WAFFLE HOUSE, INC., a Georgia Corporation, | ) ) ) | |
| | ) | |
|     Plaintiffs, | ) | Adv. No. 11-02008 |
| | ) | |
| vs. | ) | |
| | ) | |
| FREEWAY FOODS, INC., FREEWAY, FOODS OF GREENSBORO, INC., GARY M. FLY, individually, LYNNE R. FLY, individually, GARY M. FLY, as Trustee of the GMF Family Trust U/A/D December 17, 1999, and LYNNE R. FLY, as Trustee of the LRF Family Trust U/A/D January 18, 2000, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
|     Defendants. | ) | |
| _____ | ) | |
| | ) | |
| FREEWAY FOODS OF GREENSBORO, INC., | ) ) | |
| | ) | |
|     Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JOE W. ROGERS, JR. and KIMBERLY S. KRAFT, | ) ) | |
| | ) | |
|     Third-Party Defendants. | ) | |
| _____ | ) | |

55

## <u>PARTIES IN INTEREST</u>

James Adams, II, Esq.

William P. Miller, Esq., Chapter 7 Trustee

William B. Sullivan, Esq.

Michael D. West, Esq., Bankruptcy Administrator